Filed 10/15/21  P. v. Zugsberger CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C090400 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE020710) |
| v. | |
| MATTHEW NEIL ZUGSBERGER, | |
| Defendant and Appellant. | |

A jury found defendant guilty of inflicting corporal injury upon M. Doe (Doe) and found true the allegation that defendant personally inflicted great bodily injury on Doe in circumstances involving domestic violence.  The trial court sentenced defendant to six years in state prison.

On appeal, defendant contends:  (1) the trial court abused its discretion in excluding expert testimony on use of force; (2) there was insufficient evidence he personally inflicted great bodily injury on his victim; and (3) due to ineffective assistance of counsel at sentencing, we must remand the matter to allow the trial court to exercise its discretion under Penal Code sections 1170.9 and 1170.91.[1]

---

[1]     Undesignated statutory references are to the Penal Code.

Finding no error, we affirm the judgment.

BACKGROUND

A.     *Underlying Facts*

In September 2017, defendant and Doe were having a sexual relationship. Defendant moved out of the house he was living in and Doe moved in. Shortly after moving into the house, Doe learned defendant was having sexual relationships with other women, so Doe ended her relationship with defendant. Defendant's ex-girlfriend Tonya Hall also lived in the house. She helped Doe by watching her 4-year-old daughter.

About a month after she ended the relationship with defendant, defendant told Doe he wanted to come to the house to collect belongings he had left behind. Concerned about potential conflict, Doe asked defendant to communicate with the property manager (Richard Hastings) to arrange the pickup. Defendant agreed but told Doe if any of his property was damaged, he was going to sue her.

At the scheduled date and time, defendant arrived at the house with his current girlfriend Christina and a few other people. Hastings was also there, Tonya was watching from inside the building (while tending to Doe's daughter), and Doe sat outside at a distance to avoid contact with defendant.

After defendant was inside the house for a short time, Hastings came out and told Doe that defendant said there was damage to some of his property. In response, defendant had called the police. The police came but told defendant and Doe it was a civil matter. According to the police, defendant seemed "agitated."

While Doe and defendant were talking with the police, Tonya yelled out the window that defendant's companions were disconnecting Doe's Wi-Fi. Irritated, Doe went inside the house to tell them it was her Wi-Fi and she saw Christina coming out of the bedroom. They argued: Doe told Christina the Wi-Fi belonged to her, Christina began yelling and cussing at Doe, and Doe told Christina defendant was having sex with the two of them at the same time. Christina demanded proof of everything.

2

The arguing continued as Christina and Doe moved to the front porch. The two were several feet apart and Doe was gesticulating with her hands. The argument was getting loud, and Doe's adrenaline was running high. Defendant did not yell out to Doe and she did not hear or see him running toward her, but the next thing she knew, defendant grabbed her upper arms and "threw [her] like a rag doll" into the house. Doe hit the open door and landed about two feet inside the threshold of the house. As she landed, she felt "extreme pain" in her right arm and heard a loud "pop."

Hastings, who had been watching the argument, had not seen any physical contact between the women but started to walk toward them so he could break up the argument before it became physical. As he did, Hastings saw defendant run by him and push Doe with force almost like "a tackle." He saw Doe "fly" backward into the house, her feet in the air.

Tonya was watching the women argue from inside the building. She too saw defendant run by "out of the blue" and "dart up" the front steps toward both women. She saw defendant throw Doe off her feet with "really huge force."

One of the officers, who had walked back to his patrol car, heard the argument and saw defendant "come from around the backside of the property and start running towards the front porch." He had not seen any physical altercation between the women and he did not hear defendant yell out. What he did see was defendant run at Doe and then Doe's legs "come flying up."

The police arrested defendant and Doe was taken to the hospital in an ambulance. Doctors determined Doe's arm was broken into three pieces. Doe's injury required surgery. During surgery doctors had to put a metal plate in her arm, along with 12 screws. To close the surgical site they used 25 staples, leaving a 10-inch scar. As a result of her injury, Doe was required to wear a sling for four weeks, she was out of work for six weeks, and she could not drive for nearly three months.

3

The People charged defendant with inflicting corporal injury upon Doe (§ 273.5, subd. (a)).  The People further alleged defendant personally inflicted great bodily injury upon Doe under circumstances involving domestic violence (§ 12022.7, subd. (e)).  Defendant pleaded not guilty.

B.     *Trial, Judgment, and Sentencing*

At trial, defendant testified that when he and his companions arrived that day, it started out "relatively peaceful."  He was annoyed when he saw damage done to some of his furniture, and after sharing his annoyance with Hastings, defendant called the police.  When the officers told him it was a civil matter, defendant became more upset because he believed it was "criminal vandalism" and he wanted them to take action.

As he was removing appliances from the back of the house, he heard the women arguing.  Already "fearful" because tensions were high, defendant moved "briskly" to the front of the house where he saw Doe with her back toward him.  She and Christina were yelling at each other.  Doe was "hovering" over Christina in what defendant described as an "aggressive bullying fashion."  He saw Doe lift her arm as Christina swatted it away.  According to defendant, he then yelled at Doe to "back off."

Still moving toward the front porch, defendant said he yelled another command for Doe to back off.  Then he saw Doe's hand come back up and contact Christina's throat.  He reached out, grabbed Doe's hand, stepped between the women, and pushed Doe backward.  He acknowledged his adrenaline was up, but to his recollection, he did not throw Doe backward.  Rather, he "stepped forward one step."

"As I pushed, it was not more like a shove push.  It was like I used my body to move, you know.  She tripped over the door threshold.  She fell down."  Defendant, however, did not actually see Doe trip.  He also admitted to law enforcement that he pushed Doe in a "severely forceful way."  Nevertheless, defendant testified he was "shocked" when Doe hit the ground because he had not intended to injure Doe, just protect Christina.

4

Defendant explained he was a former corporal in the Marine Corps, from which he was honorably discharged in 1995. As a marine he learned about human anatomy and received specialized training in self-defense for the purposes of arresting, disabling, and killing human beings with his hands. As part of that training, defendant learned the throat is a vulnerable area because it is usually exposed, even in combat gear. He was taught that, in close quarters, if he were facing an oncoming attack and his weapon jammed, he should go for the attacker's throat. An attack to the throat, he said, can be debilitating.

Christina also testified at trial. According to Christina, she felt threatened by Doe. When she and Doe were arguing on the front porch, Christina was afraid Doe was going to throw her off the porch. She remembered Doe reaching out and putting her hand around Christina's throat at the base of the neck. When asked, Christina said she did not know if Doe was pushed to the ground or if she stumbled. Christina told the police officer that Doe had injured her upper chest area. The officer examined her upper chest and saw redness, but no injury.

In closing, the defense argued he was not guilty because "this is a defense of Christina . . . . I think at a minimum I think there was a hand on the throat. [Defendant] saw it. He came and pushed her away, and she fell down, whether she tripped or she didn't because of the force of the push, it's completely reasonable to do that when someone's got their hand around someone else's throat, and I think we can all agree on that."

The jury found defendant guilty as charged.

At sentencing, defendant's trial counsel said:

"[Y]our Honor, I just think I'm compelled to make a record is [*sic*] the following:

"[Defendant] is a veteran of the United States Marine Corps. And I can't -- couldn't find anything in my records and I did not affirmatively reach out in regards to him perhaps being eligible for [v]eterans' [c]ourt.

"My -- to my discredit, I think I assumed because of the enhancement and the allegation that he might not -- I thought he was automatically disallowed from participating in that.

"So that's the only thing that I -- gives me pause. And that was brought up by [defendant] yesterday in a telephone conversation because it was brought to his attention . . . . And [defendant] ultimately submitted the request for information, but that was done all within the last 48 hours."

The trial court sentenced defendant to an aggregate term of six years in state prison. In sentencing defendant to the low term, the court found defendant was not eligible for probation absent unusual circumstances, but found no such circumstances. The court noted this was not defendant's first felony conviction, but also found the circumstances did not warrant the middle term recommended by the probation department: "the assault itself was . . . very brief, not a sustained or prolonged or series of assaults . . . ."

The court explained to defendant, "you present as an intelligent and complex person who has many good qualities. They were not on display the day that you committed the offense for which you were convicted in this court. And in sentencing you, I do not conclude that you are irredeemably evil or something like that. I just find that for the offense that you committed, which caused very significant injury to . . . Doe, that a State prison sentence is warranted."

The court also imposed a $1,000 restitution fine and a matching parole revocation fine, staying the latter, and ordered defendant to pay direct victim restitution totaling $7,898.

## DISCUSSION

A.    *Sufficiency of Evidence - Great Bodily Injury*

Defendant argues that substantial evidence does not support the great bodily injury enhancement because he did not personally inflict the injury to Doe. Specifically,

6

defendant claims he did not throw Doe to the ground, causing her arm to break; rather, she tripped over the door's threshold when he shoved her. Thus, defendant contends, he is only the proximate cause of Doe's injury, rather than the direct cause.

Subdivision (e) of section 12022.7 is a sentencing enhancement for a defendant "who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony . . . ." (§ 12022.7, subd. (e).) To "personally inflict" the injury, the actor must be " 'the direct, rather than [the] proximate, cause of the victim's injuries.' " (*People v. Elder* (2014) 227 Cal.App.4th 411, 418; *People v. Warwick* (2010) 182 Cal.App.4th 788, 793.) Courts have adopted the nonlegal meaning for the phrase " 'personally inflicts' " injury. (*People v. Cross* (2008) 45 Cal.4th 58, 68.) Specifically, the phrase means that the actor "directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured.' " (*Ibid.*; *Warwick*, at p. 794; *People v. Slough* (2017) 11 Cal.App.5th 419, 423.)

We reject defendant's argument that he was only indirectly responsible for Doe's injury. It is undisputed that defendant put his hands on Doe, which resulted in her falling to the ground and breaking her arm. Whether defendant threw Doe to the ground or she tripped when he shoved her, defendant's volitional act of putting his hands on Doe caused her *either* to trip or fall and break her arm. There is no distinction between the injury caused by defendant throwing Doe to the ground or Doe tripping because defendant shoved her. Both would directly cause her injury. These circumstances sufficiently support the enhancement that defendant directly and personally inflicted the injury.

B.     *Expert Testimony*

Defendant contends the trial court abused its discretion in refusing to admit expert testimony that a trained marine would know the throat or neck is a particularly vulnerable area of the human body. There was no abuse of discretion.

7

*1.    Additional Background*

During trial, defendant sought to introduce an expert witness to testify on the "vulnerability of the neck area."  The expert would "not only talk to the vulnerability of the neck from an objective, reasonable person's perspective, but also subjectively from a trained Marine or ex-Marine as he actually trained Marines himself."

So, he "would actually have a very unique perspective as to a non-Marine and a Marine and their -- and as it relates to vulnerability of the neck, which I think is also common sense."

"[The expert's] primary purpose in why the neck conversation is necessary is as to the reasonable force we perceived used by [defendant] in the moment."  In other words, if defendant believed Doe was putting her hands on Christina's throat, he was reasonable in using the force he used to stop Doe because, as a trained marine, he knew Christina could be in "mortal" danger if her throat were the focus of Doe's attack.  The People objected.

The trial court was not persuaded by defendant's argument and found the testimony irrelevant:

"The argument made is not substantive.  The issue as to whether the defendant thought that the neck was vulnerable and thought that his actions were reasonable has already been testified to by the defendant.

"The point you make, [defense counsel], about a matter of common sense actually is a term that I think applies here in respect to there not being a need for or a virtue to calling an 'expert' on this subject.  It is a matter of common sense that somebody could be hurt at their neck.  There is no need for an expert to come in and testify to that any more than you would be able to put a[n] ear, nose[,] and throat specialist on to testify [about] the vulnerability of the neck in this matter.

"I also find under [Evidence Code section] 352 that it would be time-consuming, potentially confusing[,] and simply, at the very best you could say for it, redundant of what jurors would already have as a matter of common sense."

*2. Legal Principles*

"Expert opinion testimony must be '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' (Evid. Code, § 801, subd. (a).)  We review the trial court's ruling in this regard for abuse of discretion." (*People v. Smith* (2003) 30 Cal.4th 581, 627.)

*3. Analysis*

Defendant wanted to offer expert testimony to establish that a former marine would know the throat area is vulnerable to injury in order to support his defense that he acted reasonably to defend Christina.  As noted by the trial court, and *even defense counsel*, the notion the throat area is vulnerable to injury is a matter of common knowledge.  Thus, it is not information that is "sufficiently beyond common experience" and not admissible as expert opinion testimony.  (Evid. Code, § 801, subd. (a).)

In addition, trial courts have the discretion to exclude evidence whose "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time."  (Evid. Code, § 352.)  Defendant had already testified that, as a former marine, he was trained to attack the throat area in a close combat situation because the throat area is particularly vulnerable to injury.  The proffered opinion testimony would be cumulative (with little to no probative value) and its introduction an undue consumption of time.  On this record, we conclude the trial court's decision to exclude the expert testimony was within its discretion.

C.  *Sentencing Under Sections 1170.9 and 1170.91*

Defendant contends the matter should be remanded to allow the court to consider sentencing him under sections 1170.9 and 1170.91.  The People respond that defendant forfeited this contention on appeal by failing to raise it in the trial court.  Whether defendant's claim is forfeited, we address the merits because he also asserts ineffective assistance of counsel.  We conclude defendant has failed to demonstrate prejudice on this record.

"The federal constitutional right to counsel 'applies at all critical stages of a criminal proceeding in which the substantial rights of a defendant are at stake.' [Citations.] A sentencing hearing is one such stage, and a defendant has a constitutional right to counsel at sentencing." (*People v. Bauer* (2012) 212 Cal.App.4th 150, 155.)

"To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant." (*People v. Rogers* (2016) 245 Cal.App.4th 1353, 1366 (*Rogers*).)

"To establish prejudice, '[i]t is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." ' [Citation.] To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.] 'The likelihood of a different result must be substantial, not just conceivable.' " (*Rogers, supra*, 245 Cal.App.4th at p. 1367.)

"A claim on appeal of ineffective assistance of counsel must be rejected ' "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Hinds* (2003) 108 Cal.App.4th 897, 901.)

"Sections 1170.9 and 1170.91 *obligate* a court to consider a defendant's service-related mental health issues, including PTSD, as a mitigating factor in evaluating whether to grant probation and in selecting the appropriate determinate term." (*People v. Panozo* (2021) 59 Cal.App.5th 825, 828; see also §§ 1170.9 & 1170.91.) Once a defendant alleges they committed their offense as a result of a specified service-related psychic injury stemming from their service in the United States military, a trial court "[is] statutorily required to make an eligibility determination and consider service-related

mitigating factors at sentencing." (*Panozo*, at p. 840.) If no such allegation is made, the trial court's statutory obligation does not arise.

Here, it is undisputed that defendant served in the Marine Corps. Counsel also acknowledged, on the record, that he wrongly assumed the sentencing enhancement automatically disqualified defendant from the benefits of sections 1170.9 or 1170.91. Based on this faulty assumption, counsel did not investigate defendant's military service background. Counsel's failure to investigate defendant's eligibility for alternate sentencing under sections 1170.9 and/or 1170.91 was constitutionally deficient. (See *People v. Scott* (1994) 9 Cal.4th 331, 351 [a defense attorney who fails to adequately understand the available sentencing alternatives and pursue the most advantageous disposition for his client may be found incompetent]; *Rogers, supra*, 245 Cal.App.4th at p. 1361, fn. 5 [in light of statutory and case law, "there can be no satisfactory explanation for defense counsel's failure to object"].)

To succeed on a claim of ineffective assistance of counsel, it is not enough to establish that counsel's performance was deficient. Defendant must also demonstrate there is a "reasonable probability that he would have received a more favorable result had counsel's performance not been deficient." (*Rogers, supra*, 245 Cal.App.4th at p. 1367.) Defendant has not met that burden on this appeal.

Here, there is no evidence that defendant " 'committed [his] offense as a result of [a specified service-related psychic injury] stemming from [his] service in the United States military.' " (*People v. Panozo, supra*, 59 Cal.App.5th at p. 840.) Without such evidence in the record, we cannot discern whether counsel even *could* have alleged defendant was eligible for alternate sentencing under sections 1170.9 or 1170.91, had he not misunderstood the law. If no such allegation is made, the trial court is not required to consider "service-related mitigating factors at sentencing . . . ." (*Ibid.*) Thus, on this record, defendant cannot establish it was reasonably probable he would have received a

more favorable result if counsel had understood the law related to sections 1170.9 and 1170.91.

Because defendant has not shown prejudice as a result of counsel's deficient performance, his ineffective assistance of counsel claim is denied.  If there is extra record evidence that defendant did indeed commit his crime " 'as a result of [a specified service-related psychic injury] stemming from [his] service in the United States military,' " he may pursue his claim through a writ of habeas corpus.  (See *People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

DISPOSITION

The judgment is affirmed.

　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　Hoch, J.

We concur:

　/s/
Raye, P. J.

　/s/
Hull, J.