Filed 3/24/22  P. v. Wood CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RUSSELL RAYMOND WOOD, JR.,<br><br>    Defendant and Appellant. | G060008<br><br>(Super. Ct. No. 20NF2441)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Frank Ospino, Judge.  Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant was conducting a one-man, belligerent political protest at an intersection. The victim (who we refer to as John) stopped his car at a red light at the intersection and was confronted by defendant. After some back and forth, the defendant retreated to the sidewalk and retrieved a club-like improvised weapon. For reasons that are unclear in the record, John, who is much larger than defendant, got out of his vehicle and approached defendant on the sidewalk. Defendant swung the weapon at John. Grainy surveillance footage shows John attempting to block the swing and then stepping into defendant as if to punch him. The two got tangled up and fell to the ground with John on the bottom. John was rendered unconscious, and defendant began raining punches down on John's face. Fortunately, a police officer happened to be nearby and quickly broke up the altercation. John had a large bruise on the back of his head, a broken nose, and cuts on his face.

Defendant was charged with three counts. In count 1, he was charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] namely, a sharp instrument that resembled an ice pick. The jury found him not guilty. In count 2, he was charged with assault with a deadly weapon (§ 245, subd. (a)(1)), namely, a metal pipe. The jury found him guilty and found it to be true that he personally inflicted great bodily injury (GBI) in the commission of count 2 (§ 12022.7, subd. (a)). In count 3, he was charged with assault likely to produce GBI (§ 245, subd. (a)(4)), but the jury found him not guilty.

Defendant raises two arguments on appeal.

First, he contends the People failed to prove that he was not acting in self-defense. Defendant contends that because John, a much larger man, approached him immediately before the altercation, he was entitled to use force to protect himself, even by proactively taking the first swing. Defendant's argument, however, turns the standard

---

[1] All further statutory references are to the Penal Code

2

of review on its head by drawing inferences in his favor.  Drawing all reasonable inferences in favor of the judgment, as we must, the evidence supports a finding that defendant provoked mutual combat, thus forfeiting a self-defense argument.

Second, defendant contends that the enhancement for personally inflicting GBI in the commission of count 2 was not supported by substantial evidence.  Defendant contends that any injuries to John occurred either by him falling, or by the series of punches afterward, which was the basis of count 3 in which the jury found defendant not guilty.  Our review of the caselaw interpreting section 12022.7, subdivision (a), however, compels us to conclude that the punches defendant delivered was still "in the commission of" the assault described in count 2, and thus the broken nose—whether caused by the club or defendant's fists—supported the enhancement.

FACTS

In the afternoon of September 14, 2020, John was driving a pickup truck in the area of Harbor Boulevard and Katella Avenue in the city of Anaheim.  As he approached and slowed to stop for a red light, he noticed defendant standing on the corner holding a sign that said "fuck Trump" while hollering and gesticulating.  Defendant approached John's car and gestured toward him; John lowered his window a little and asked defendant what he wanted.  Defendant demanded that John say "fuck Donald Trump."  When John rolled his window back up, defendant grew more agitated and hollered, "That's going to cost you a tire, motherfucker."  John noticed defendant had an implement that resembled a screwdriver or an ice pick.

Defendant moved toward the back of John's truck and John heard some sort of noise. In the rear view mirror John could see defendant crouched near the rear passenger-side tire.  John hurriedly got out of his truck and ran around the back to confront defendant.  Defendant continued demanding that John say "fuck Trump."  John

3

said, "Why do you hate the president?" and yelled at defendant to get away from his truck. John then noticed a dent in the tailgate of his truck.

According to John's testimony, defendant sprang up and pointed the weapon at John "like an on-guard kind of a thing . . . ." The two were yelling at each other, though John could not remember exactly what was said, only that they were agitated and the situation was tense. John testified that defendant lunged at him with the weapon, though the jury's acquittal on count 1 indicates it did not believe John's testimony, and the surveillance footage does not reflect any lunging.

Instead, the surveillance footage shows that after defendant spent a few seconds near the back of John's car, he walked back to the sidewalk.[2] John then got out of his car and confronted defendant on the sidewalk. After several seconds, John walked back to his car and inspected his rear fender, then got back into his vehicle.

Defendant, now back on the sidewalk, retrieved a "short club of some sort." A photo of the weapon was admitted into evidence. It consists of a handle, a short rubber hose, and a club attached to the hose. This construction allowed defendant to whip the club as opposed to simply swinging it.

With the club in hand, the surveillance footage shows defendant walked back towards John's vehicle, stopped several feet short, and gesticulated in a manner suggesting he was shouting at John. Defendant then retreated toward the sidewalk. At the same time, John got back out of his vehicle and walked toward the sidewalk to confront defendant. (John denied this on cross examination, but the surveillance footage shows it clearly.)[3]

---

[2] Due to the distance of the camera, the surveillance footage of the altercation is heavily pixelated. Nevertheless, one can see the basic movements of John and defendant.

[3] Defense counsel was the one who acquired the surveillance footage, and thus neither the prosecution nor John had seen the footage until John's cross examination.

4

John testified, and the surveillance footage seems to show that defendant was swinging his club back and forth in a threatening fashion. The surveillance footage then shows defendant took one swing at John. John appeared to put an arm up to block, then stepped into defendant as though to throw a punch. However, as he stepped forward the two got tangled up and eventually they fell hard to the ground with John on the bottom.

John testified that he blacked out: "it [the weapon] was waving back and forth, swinging, swinging, swinging, swinging like that, and then I was blacked out." "When I came to, I was on my back . . . having my face pounded and I had the complete sense of helplessness in that I couldn't respond." "So I assume I was knocked out. I don't recall anything . . . ." So . . . I would say I assume, but I don't know." John was asked, "Does that mean basically you can't remember between that swinging by your face and then you woke up being punched in the face on the ground?" His answer: "That's right."

An Anaheim police officer was, serendipitously, responding to an unrelated call near the scene of the altercation. As he was dealing with that unrelated call, several people honked their horns to get his attention and let him know that a fight had broken out nearby. When the officer looked over, he saw defendant mounted on top of John, punching John repeatedly in the face. The officer estimated he saw six to eight punches. John appeared to be unconscious. The officer, who was about 30 yards away from the fight, ran over, tackled defendant, and restrained him.

After the police officers had broken up the fight, paramedics examined John. John had what appeared to be a broken nose, several cuts on his face, and a "knot" on the back of his head. The responding officer described it as "a three- or four-inch hematoma lump, swelling on the back of his head." The bump on the back of John's head was consistent with falling and striking his head on the asphalt. He had more

5

swelling on the left side of his face than the right, which was consistent with blunt force trauma.

The officer located the two weapons (the ice pick and the club) on the ground a couple feet from where the fight took place. There is no indication the weapons were used after defendant and John fell to the ground.

Once the paramedics had examined him, John drove himself to his parents' house nearby. The responding officers did not speak to John before he left, which was admittedly an "oversight" on their part.

John is six feet, four inches tall and weighs approximately 250 pounds. Defendant is approximately five feet, six inches tall, and weighs approximately 140 pounds.

During the course of the trial, defense counsel questioned John about whether he had told his father that the political organization Antifa was responsible for assaulting him. John denied it. John admitted to a second incident on a local freeway where he was apparently injured in a similar altercation, and he was asked about telling his father that Antifa had assaulted him in that incident as well. Again, he denied it. However, defense counsel had subpoenaed John's father to testify, and John admitted telling his father to ignore the subpoena. On redirect, John admitted to telling his father that Antifa attacked him during the freeway incident, which occurred a couple months before the incident underlying this case.

DISCUSSION

Defendant raises two issues on appeal. First, he contends there was insufficient evidence to prove he was not acting in self-defense. Second, he contends the enhancement for personally inflicting GBI while committing the assault described in count 2 was not supported by substantial evidence.

6

Both arguments require us to assess whether substantial evidence supports the verdict. "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and '"substantial" proof of the essentials which the law requires in a particular case.'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006 (*O.B.*).) We draw all reasonable inferences in favor of the judgment. (*People v. Ramirez* (2006) 39 Cal.4th 398, 463) We then determine whether, based on such inferences, a juror could rationally find that a particular fact had been proven beyond a reasonable doubt. (*O.B.,* at p. 1008-1009.) "[A]n appellate court should review the record for sufficient evidence in a manner mindful of the elevated degree of certainty required by this standard." (*Ibid.* at pp. 1000-1001; see also *People v. Soriano* (2021) 65 Cal.App.5th 278, 284.)

1. Self-Defense

We begin with defendant's contention that there was insufficient evidence to support a factual finding that defendant was not acting in self-defense. Although often thought of as an affirmative defense, it is the People's burden to prove the defendant was *not* acting in self-defense. (CALCRIM 3470 ["The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful [self-defense]."]; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1252.)

A case of self-defense exists where the defendant reasonably believed he was in imminent danger of suffering bodily injury, reasonably believed that the immediate use of force was necessary to defend against that danger, and used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 3470.) A defendant is not required to retreat as a preferred or required alternative to exercising his right to self-defense. "He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the

7

danger . . . has passed. This is so even if safety could have been achieved by retreating." (CALCRIM No. 3470.)

However, there are two relevant restrictions on the right to self defense. First, a person who engages in mutual combat cannot claim self-defense unless that person tried to stop fighting, communicated that intent, and gave the opponent a chance to stop fighting. (CALCRIM No. 3471.) Second, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) The jury was instructed on both of these exceptions.

Both exceptions are relevant here. Drawing all inferences in favor of the judgment, the jury could conclude that defendant provoked a physical confrontation and then engaged in mutual combat. Defendant, who was armed at all times with one weapon or another, made various threatening and provocative statements to John. He then attempted to (and possibly did) damage John's truck. He then retrieved a second weapon while continuing to act in a provocative way. When John took the bait, defendant swung his club menacingly and then took the first swing. These facts support a finding that defendant provoked John into mutual combat.

Defendant would have us view the facts in a very different light. He emphasizes that John, a much bigger man, "confronted [defendant] not once, but twice." He emphasizes that a person is not required to give his attacker the chance to "beat[] him senseless" before acting in self defense. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1044 (*Ross*).) However, we are compelled to view the facts in the light most favorable to the judgment, not to defendant. While defendant exaggerates the belligerence of John's behavior, he minimizes or even ignores the far more belligerent character of his own behavior. Based on defendant's behavior, the jury could reasonably conclude that defendant intended to pick a fight. (See *Id.* at p. 1045 ["'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.*"].)

8

2.  Great Bodily Injury

Next, defendant contends substantial evidence does not support the enhancement on count 2 for personally inflicting GBI. Penal Code section 12022.7, subdivision (a), provides, "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." Defendant highlights two aspects of this statute in contending it does not apply here. First is the requirement that a defendant "personally inflicts" the injury. Case law has interpreted this to mean that "the defendant must be the *direct,* rather than proximate cause, of the victim's injuries." (*People v. Warwick* (2010) 182 Cal.App.4th 788, 793.) Second, the injury must occur in the commission of the charged felony.

The People rely on three injuries to satisfy the GBI requirement: the bruises and cuts on John's face, his broken nose, and him being knocked unconscious. We will focus on the broken nose.[4]

Generally speaking, a broken nose will support a jury's finding of GBI. (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464-465 ["a jury 'very easily' could find a broken nose constitutes [GBI] as a matter of fact if it 'results in a serious impairment of physical condition.'"].) On appeal, defendant does not challenge that element and "assumes that [John] suffered great bodily injury."

Nevertheless, defendant contends he cannot be liable for the enhancement because the broken nose did not occur in the commission of count 2—assault with the club. Rather, defendant argues the evidence shows defendant "never hit [John] in the

---

[4]     The parties vigorously debate whether defendant personally inflicted the injury that knocked John unconscious. Defendant presents a colorable argument that John was knocked unconscious by a fall rather than anything that defendant personally inflicted. Ultimately, however, we need not address that argument as, for the reasons we express below, the broken nose supports the jury's verdict.

9

head" with the club. Instead, John "got hurt in one of two ways: 1) when he charged [defendant], got tangled up with him, and crashed to the sidewalk, and 2) when appellant punched him repeatedly, which underlies the charge in count three, not count two. The second scenario cannot sustain the enhancement on count two because in acquitting [defendant] of felony assault in count three, the jury found that appellant's punches were not force likely to inflict GBI. Neither aspect of the encounter amounts to personal infliction of GBI in count two."

Defendant's argument rests on the premise that the assault described in count 2 ended as soon as defendant stopped using the club, and any further injury can only be ascribed to a separate assault described in count 3. That, however, is not how courts have interpreted the language "in the commission of" as applied to assault with a deadly weapon.

*People v. Elder* (2014) 227 Cal.App.4th 411 (*Elder*) is on point.[5] There, the defendant was convicted of, among other things, assault with a deadly weapon and the jury found true that he inflicted GBI in the commission of that charge. (*Id.* at p. 413.) What occurred, in short, was that the defendant assaulted the victim with the butt of a gun, the victim fought back, the defendant attempted to flee, the victim attempted to restrain the defendant, and in the process of restraining him the victim dislocated a finger. (*Id.* at p. 415.) The question on appeal was whether that dislocated finger occurred "in the commission" of the assault with a deadly weapon. The court answered in the affirmative. (*Id.* at p. 421.) After an extensive review of relevant caselaw, the court concluded that injuries inflicted during an attempted escape—which is plainly after the crime has technically been completed—are still "in the commission" of the crime.

One of the cases the *Elder* court relied on was *People v. Jones* (2001) 25 Cal.4th 98 (*Jones*), where our high court interpreted section 667.6, subdivision (e)(3),

---

[5] Neither party cited *Elder* or discussed the line of cases interpreting "in the commission of".

which provides enhanced penalties for using a deadly weapon "in the commission of" certain sex crimes. The court interpreted that section as follows: "such use may be deemed to occur 'in the commission of' the offense if it occurred *before, during, or after* the technical completion of the felonious sex act." (*Jones, supra*, at p. 110.)

The *Elder* court also relied on *People v. Walls* (1978) 85 Cal.App.3d 447, where the defendants were convicted of burglary with an enhancement for personally inflicting GBI. The defendants broke into an apartment with the intent to steal money. Once inside, they found a shotgun and used it to beat the victim. (*Id.* at pp. 450-451.) On appeal, they argued they had not caused GBI in the commission of the burglary because the burglary was complete the moment they entered the apartment with felonious intent. (*Id.* at p. 452-453.) The court rejected the argument, stating, "To establish commission of a burglary the prosecution need only prove that one entered the premises with the intent to commit theft or a felony, and the crime is complete for that purpose, but this does not dictate the conclusion that the crime is complete for all purposes precluding consideration of the acts and conduct of the intruder after entry as part of the commission of the crime. . . ." (*Id.* at p. 453.)

These cases compel us to reject defendant's argument. Even assuming that the club did not cause the broken nose, defendant's assault of John did not terminate the moment he dropped the club, but instead continued, at least for purposes of enhancements, so long as the overall assault was ongoing. Plainly, defendant broke John's nose and thereby personally inflicted GBI. Whether he did it with the club or with his fists immediately afterwards is of no moment. Substantial evidence supports the verdict.

Defendant's argument is premised, in part, on the inconsistency of the jury's verdict. We acknowledge that the verdict was inconsistent. If the defendant committed assault with a deadly weapon and *actually* inflicted GBI, did he not also commit assault with a *likelihood* of GBI? While there might be some slight logical

11

wiggle room there, under the facts of this case, it is virtually impossible to reconcile those findings.  That inconsistency, however, does not affect our task on appeal, which is simply to determine whether substantial evidence supports the guilty verdict.  "It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.]  The United States Supreme Court has explained: '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts.  This review should not be confused with the problems caused by inconsistent verdicts.  Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt.  [Citations.]  This review should be independent of the jury's determination that evidence on another count was insufficient."  (*People v. Lewis* (2001) 25 Cal.4th 610, 656.)  The rationale for this rule is that "[a]n inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*Ibid.*)  Accordingly, the inconsistency of the verdict does not undermine our finding that substantial evidence supports the GBI enhancement.

DISPOSITION

The judgment is affirmed.


MARKS, J.*

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.