[No. G041970. Fourth Dist., Div. Three. Mar. 4, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ASHLEE RENEE WARWICK, Defendant and Appellant.

**COUNSEL**

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, Steve Oetting and Robin Derman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOORE, J.**—Defendant Ashlee Renee Warwick gave birth to her son in her bedroom and concealed the birth, just as she had concealed her pregnancy. By the time the infant was discovered, he was seriously ill. Defendant was convicted of child abuse and neglect under Penal Code section 273a, subdivision (a)[1] and the jury returned a true finding on an enhancement alleging that she had personally inflicted great bodily injury on her child. (§ 12022.7, subd. (d).) Defendant, now on probation, contests the true finding on the enhancement. She argues that her actions did not "personally inflict[]" great bodily injury within the meaning of the statute, and further claims the jury was improperly instructed on this point. We find that defendant's contentions are without merit and affirm.

## I

## FACTS

Defendant was 18 years old when she gave birth to her son in April 2007. At the time, she was living with her mother, Barbara Villa, and her stepfather, Ray Villa,[2] as well as defendant's aunt, Becky Hughey, and defendant's younger brother. Although she had apparently talked to her boyfriend and at least one friend about her pregnancy, she concealed her pregnancy from her family.[3] She had seen doctors twice in April 2007 for other reasons, but did not inform them she was pregnant and did not seek any prenatal care.

In the early morning hours, defendant was at home and began having contractions. Ray was also at home, but defendant did not ask him for assistance. By 7:30 or 8:00 in the morning, defendant's contractions were five to 10 minutes apart. Barbara worked the graveyard shift and was home sleeping by this point, but defendant did not seek her help.

According to defendant, the birth happened later in the morning, sometime after 9:30, perhaps around 10:30. She delivered the placenta and cut the umbilical cord with a pair of scissors; the cord did not bleed. Defendant did not hear the baby cry, but believed he was breathing. She "wiped it off a little bit, cleaned his mouth off with a little, like a wet cloth." Defendant stated that

---

[1] Subsequent statutory references are to the Penal Code.

[2] As we will be referring to both defendant's mother, Barbara Villa, and her stepfather, Ray Villa, we use their first names to avoid confusion. No disrespect is intended.

[3] Defendant was quite heavyset, weighing 255 pounds at the time of the birth.

she "tucked my blanket around him,"[4] after which she fell asleep for 45 minutes or so. She woke when she heard the baby whimpering. Defendant felt exhausted, but she made sure the baby was breathing. She tried to breastfeed, but failed when the baby would not "latch on." After that, he did not whimper again, and according to defendant, he fell asleep.

At one point, Barbara came to the door, and defendant told her mother that she was tired. According to Barbara, this occurred about 1:00 p.m., and she left defendant alone. Barbara returned, however, about 3:00 p.m., and this time defendant opened the door and let her in. Defendant was very pale, and staggered out and went into the bathroom. Barbara went into the room and saw the baby on the bed. She called for help, and both Ray and Hughey responded.

Ray had CPR (cardiopulmonary resuscitation) training from the military and through his job. At the time he entered the room, the baby had a blanket covering his forehead, but he was not wrapped in the blanket and was otherwise uncovered. Ray realized the baby was breathing and began performing CPR. Ray noticed the baby's nose and mouth had been cleared and saw that the umbilical cord had been cut. The baby was cool to the touch, was not crying, and appeared to be in distress. Hughey, meanwhile, called the paramedics. She described defendant as not acting like herself, and Hughey thought defendant was in shock.

The paramedics arrived and discovered the baby had a very low respiratory rate, was pale, and generally unresponsive. The baby was nearly in cardiac arrest. At Riverside Community Hospital, emergency room doctor Ernest Woodhouse observed that the baby had a very low level of oxygen, was quite cool, and was in respiratory failure. The baby's temperature upon admission was 81 degrees.[5] He was also in a coma, and the doctor described his overall condition as life threatening.

Dr. Louis Martincheck, a neonatal specialist, described the baby as the most hypothermic he had ever seen. According to Martincheck, leaving an

---

[4] Whether and how the baby was covered was disputed. Defendant stated she had covered him, and Barbara testified at trial that the baby was mostly "covered." She had earlier given a statement to the police, however, stating that she found the baby uncovered with a blanket over his face and head. This was consistent with Ray's statement that when he entered the room, the baby had a blanket covering his forehead but was otherwise uncovered.

[5] Defendant's expert at trial was skeptical of this temperature reading for a number of reasons. She thought 81 degrees was improbable for someone who had not been at the bottom of a lake or in a similar situation, although another doctor disagreed. The baby's temperature reading a short while later was 93 degrees, and she testified that his temperature could not have increased that much over such a short period of time. Two other doctors testified that the increase in temperature was safe and proper.

infant uncovered for five to six hours would explain the low body temperature, which is not a condition that is achieved quickly. Martincheck believed the baby would have died without medical intervention.

The baby was transferred to Loma Linda University Children's Hospital. Dr. Elba Fayard, clinical director for the neonatal intensive care unit, was involved in admitting the baby and reviewed his records. He had some epidural bleeding on the brain, a fairly common condition probably caused by his movement through the birth canal. The baby also had dead brain cells in the center of his brain, unrelated to the epidural bleeding and probably caused by the hypothermia and lack of oxygen. This condition was consistent with not having been swaddled or receiving proper care for six hours after birth. As a result, the baby might experience learning or behavioral problems in the future, though it was also possible he would suffer no long-term consequences. Such problems might not be noticeable until he reaches school age.

The mother was also treated at the hospital by Dr. Serafin Salazar, an obstetrician and gynecologist. Defendant showed signs of severe preeclampsia—elevated blood pressure, blurry vision, and some abnormal blood tests. Preeclampsia is a potentially deadly complication, and an expert for defendant testified at trial that it could have affected her cognitive functioning. There was no evidence, however, that defendant's condition worsened after she gave birth. The cure for preeclampsia is to give birth, and defendant improved rapidly after her admission to the hospital.

On October 11, 2007, an information was filed charging defendant with attempted murder (§§ 664, 187, subd. (a); count one), and child abuse or neglect under circumstances likely to cause great bodily injury (§ 273a, subd. (a); count two). The information also alleged an enhancement under section 12022.7, subdivision (d), alleging that defendant had personally inflicted great bodily injury upon a child under the age of five years. At the conclusion of trial, defendant was acquitted on count one but found guilty on count two. The jury also found the enhancement alleging infliction of great bodily injury was true.

At sentencing, defendant's motion to strike the great bodily injury enhancement was denied. The court found, however, that the circumstances justified placing defendant on probation, subject to various terms and conditions, including that she spend a year in custody. Due to time already served, defendant was entitled to immediate release. She now appeals.

## II

## DISCUSSION

*"Personally Inflicted"*

Defendant admits that her negligence was responsible for her child's severe injuries, admitting the baby suffered great bodily injury. She argues, however, that she did not "personally inflict" these injuries as required by section 12022.7, subdivision (d). That subdivision states: "Any person who personally inflicts great bodily injury on a child under the age of five years in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for four, five, or six years."

Defendant argues in her opening brief that the meaning of "personally inflicts" requires a "personal and direct application of force. It does not mean injuries that are the result of a passive failure to act." The cases she cites, however, do not go as far as she claims. Defendant begins with *People v. Cole* (1982) 31 Cal.3d 568 [183 Cal.Rptr. 350, 645 P.2d 1182] (*Cole*). The question in *Cole* was whether the enhancement could apply to a person who ordered an assault, but did not participate in it. The court held it could not, but applied only "to a person who himself inflicts the injury." (*Id.* at p. 572.) As this is not an aider and abettor case, *Cole* has little direct application here, though it does provide a definition of " 'personally,' " for which the court adopts the dictionary definition of " 'done in person without the intervention of another; direct from one person to another.' " (*Ibid.*)

Defendant next cites *People v. Rodriguez* (1999) 69 Cal.App.4th 341 [81 Cal.Rptr.2d 567] (*Rodriguez*), which held that the enhancement did not apply in a situation where a police officer was seriously injured while tackling a fleeing defendant. (*Id.* at pp. 345–346.) The court held that " 'personally inflict' has a distinct meaning and that its use in a statute signifies a legislative intent to punish only the actor who directly inflicts an injury." (*Id.* at pp. 348–349.) Thus, the fact that the defendant proximately caused the police officer's injuries was not enough, because the defendant did not directly act to cause the injury. (*Id.* at p. 349.) Taken together, *Cole* and *Rodriguez* do not help defendant. They merely stand for the proposition that for the enhancement to apply, the defendant must be the *direct*, rather than proximate, cause of the victim's injuries. That requirement is certainly fulfilled here. Overwhelming evidence supports the conclusion that defendant's actions and inaction were the direct as well as proximate cause of her child's injuries.

Defendant next turns to the definition of "inflict," but once again, the cited cases do not support her claim of error. In *People v. Guzman* (2000) 77 Cal.App.4th 761 [91 Cal.Rptr.2d 885], the defendant, driving while intoxicated, made an unsafe left turn. A collision occurred and the defendant's passenger was injured. (*Id.* at p. 763.) The court *rejected* the defendant's argument that he did not personally inflict great bodily injury to his passenger, finding that the defendant's act of turning his car into oncoming traffic "was the direct cause of the collision and therefore was the direct cause of the injury." (*Id.* at p. 764.) Like *Cole* and *Rodriguez, Guzman* addresses the requirement of "personally" causing the injury. It does not define "inflict" in any particular way.

*People v. Jackson* (2000) 77 Cal.App.4th 574 [91 Cal.Rptr.2d 805] is the only case defendant cites that directly supports her view that a direct application of force is required to "inflict" injury. (*Id.* at p. 578.) *Jackson,* however, was interpreting section 273.5, which includes a specific definition of injury that requires the use of physical force. (§ 273.5, subd. (c).) That statute is not at issue here.

Recently, in *People v. Cross* (2008) 45 Cal.4th 58 [82 Cal.Rptr.3d 373, 190 P.3d 706] (*Cross*), the court interpreted section 12022.7, subdivision (a), an enhancement with nearly identical language to subdivision (d): "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).)

The court in *Cross* held that nonforcible but unlawful sexual conduct with a minor supports a finding of great bodily injury, and specifically rejected the view advanced here: "To the extent defendant argues that great bodily injury invariably requires the application of physical force to the victim in order to cause great bodily injury, we reject that view. 'A plain reading of Penal Code section 12022.7 indicates the Legislature intended it to be applied broadly' [citation], and therefore the statute itself sets out the only criminal offenses—murder, manslaughter, arson, and unlawfully causing a fire, each of which incorporates enhanced sentencing for such injury—that are not subject to a finding of great bodily injury [citation]." (*Cross, supra,* 45 Cal.4th at p. 66, fn. 3.) Further, the court noted: "[T]he meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning. Commonly understood, the phrase 'personally inflicts' means that someone 'in person' [citation], that is, directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured' [citation]." (*Id.* at p. 68.)

Defendant, addressing *Cross* for the first time in her reply brief, alters her argument somewhat. Instead of claiming that force is required, she argues that taking "affirmative action" is required. We disagree that this correctly reflects the holding in *Cross*. As stated above, the court stated that "personally inflicts" means that the defendant directly, rather than through an intermediary, " 'cause[s] something (damaging or painful) to be endured' [citation]." (*Cross, supra,* 45 Cal.4th at p. 68.)

■ In our view, this definition does not preclude the failure to act where action is required, and in this case, action was most certainly required. But even if we accepted defendant's view, she did take "affirmative action," albeit actions that were direct and ineffectual—defendant's actions after her child's birth directly caused his injuries, including only partially covering him with a blanket rather than properly swaddling him. This led directly to his hypothermia and nearly caused his death. Effectively sending her mother away from the door was also affirmative action that kept the baby from getting help for several hours. Under either definition, defendant "personally inflicted" great bodily injury on her child.

*Instructional Error*

Defendant's opening brief claims that the court erred by not instructing the jury that a "direct application of force" was necessary if she was to be found to "personally inflict" great bodily injury. Her reply brief alters this argument somewhat, apparently in response to respondent's citation of *Cross*, claiming that the jury had to be instructed that she had to take some affirmative action that resulted in injury to the child.

■ Assuming that defendant did not waive this claim by failing to raise it below, her argument must nonetheless fail. Under *Cross*, as we discussed above, "affirmative action" is not necessary, so the instruction defendant now proposes would have been an incorrect statement of the law. Further, a trial court has no obligation to provide amplifying instructions for commonly understood terms in the absence of a request to do so. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1318–1319 [76 Cal.Rptr.2d 160, 91 Cal.Rptr.2d 160].) *Cross* explicitly states that " ' "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." [Citations.]' [Citation.] Here, the meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning." (*Cross, supra,* 45 Cal.4th at p. 68.) Thus, the court had no sua sponte duty to instruct on the meaning of "personally inflict" without a request by defendant. There was, therefore, no error.

## III

## DISPOSITION

The judgment is affirmed.

Sills, P. J., and Bedsworth, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 17, 2010, S181826.