Filed 5/20/25

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORGE ALBERTO MILLAN et al.,<br><br>    Defendants and Appellants. | F087198<br><br>(Super. Ct. Nos. BF185360A,<br>BF185360B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant Jorge Alberto Millan.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant Elizabeth Jara.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. and III. of the Discussion.

# INTRODUCTION

Defendants Jorge Alberto Millan and Elizabeth Jara were charged with the attempted murder of their six-week-old son X. (Pen. Code,[1] §§ 187, subd. (a), 664; count 1), torture of X. (§ 206; count 2), felony child abuse of X. (§ 273a, subd. (a); count 3), and misdemeanor child abuse of their one-year-old daughter L. (§ 273a, subd. (b); count 4). As to counts 1 and 3, the information alleged defendants personally inflicted great bodily injury (§ 12022.7, subd. (d)).

A jury found Millan guilty as charged and found true the great bodily injury enhancement. The jury found Jara not guilty on count 1, guilty on count 2 of the lesser included offense of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), and guilty as charged on counts 3 and 4. The jury also found true the great bodily injury enhancement to count 3. Various aggravating sentencing factors were found true as to both defendants. Millan was sentenced to a term of life with the possibility of parole. Jara was sentenced to an aggregate term of nine years, which includes a five-year term for the great bodily injury enhancement.

On appeal, Jara argues the evidence is insufficient to support the jury's finding that she *personally* inflicted great bodily injury, as required to support the great bodily injury enhancement to count 3. She further argues her counsel was constitutionally ineffective in failing to request certain special instructions regarding the great bodily injury enhancement.[2] Millan argues the evidence is insufficient to support his convictions for attempted murder and torture.

In the published portion of the opinion, we hold the evidence does not support a finding that Jara personally inflicted great bodily injury on X. We therefore vacate the

---

[1] Undesignated statutory references are to the Penal Code.

[2] In her opening brief, Jara also stated her intent to join in all issues raised by Millan that might benefit her. However, in her reply brief, she acknowledges that Millan raised no such issues.

true finding on the great bodily injury enhancement as it pertains to Jara and, as a result, her sentence.  We otherwise affirm the judgment.

In the unpublished portion of the opinion, we reject Millan's contentions and affirm his judgment in its entirety.

## FACTUAL BACKGROUND

Millan and Jara have two children:  L., born in March 2020, and X., born in March 2021.  The allegations in this case arose after Jara brought six-week-old X. to urgent care, where medical staff noticed he had multiple significant injuries.

### I.      Urgent Care and Hospital Observations

On May 3, 2021, Jara took X. to an urgent care in Shafter for complaints regarding his leg.  A nurse practitioner examined X. and noticed his left leg and testicles were swollen.  Jara could not explain the cause of the injury.  The nurse practitioner called for an ambulance and continued to examine X.  She noted that his right arm was swollen and he had old bruising on his chest.  He had a hematoma in his left eye and a small scratch on his upper eyelid, which Jara reported was self-inflicted.  He had a dark brown circle on his left heel that Jara could not explain.  He had a healing scar on his left neck that Jara reported putting ointment on.  X. did not cry, which the nurse practitioner found unusual.  He had no facial expression, which the nurse practitioner explained "is a face that we can see they're in pain.  They're suffering."

The nurse practitioner summoned law enforcement due to what she viewed as multiple signs of abuse.  However, the ambulance arrived first and transported X. to a hospital in Bakersfield.

Kern County Sheriff's Deputy J. Ackerman was dispatched to the hospital, where he observed that X. had several bruises on his body, including on his genitals, right and left legs, right knee, right and left arms, chest, and chin area.  X. had a burn on his left foot that appeared to be from a lighter and appeared to show "the top metal port of a lighter or a torch, the cylindrical shape, and then the line that goes up may be possibly

3.

part of the strike blade or the wheel of a lighter." He had swelling on his left leg and right arm, and a splint on his arm. His right foot had a scar from a prior blood draw. He had an abrasion and possible infection on his neck. His eyes were red and possibly infected. During the 30 to 40 minutes Ackerman was at the hospital, X. cried consistently.

Ackerman interviewed Jara at the hospital. Jara initially reported that she brought X. to the urgent care because she thought he had been bit by a spider on his leg. She later stated, "I thought his leg was broken, so that's why I took him to urgent care." She reported she noticed X.'s swollen leg that same day. Jara initially reported that the last time she had seen X. was the prior morning. She later reported that she last saw X. on Saturday evening and he was fine.[3] She reported that the injury on his foot was from having his blood drawn. It had bubbled and popped, and she thought it was normal. She did not know his arm was broken. She reported the condition of her house was "not that good."

## II. Millan's Statements

Sheriff's deputies responded to Millan and Jara's residence in Wasco on May 3, 2021. Also living in the home were Millan's parents and his five younger siblings. There, Kern County Sheriff's Deputy D. Manriquez contacted Millan and placed him under arrest.[4]

Manriquez transported Millan to a sheriff's substation and interviewed him. Millan reported that, the day before, a 20-inch box fan fell out of a window and partially onto X. and he started crying. Millan denied that X. cried frequently and reported that he cried only when "he's poop, hungry, or when he's cold."

---

[3] May 3, 2021, was a Monday.

[4] Evidence regarding Manriquez's interview of Millan was admitted only against Millan.

Manriquez informed Millan that "a couple of [his] family members" reported Millan had an anger problem, which Millan conceded. However, he stated he would not take his anger out on his kids. Millan conceded that, on one occasion, he grabbed X. by his hand and pulled on his arm to put a blanket under him, and he was not sure whether he may have been too rough. However, X. did not cry and Millan did not hear anything pop. Later, after Jara bathed X. and started moving his shoulder to dress him, he began to cry. Jara told Millan, " 'Oh, just don't do that again.' " When Manriquez showed Millan a picture of X.'s injuries, "Millan was very matter of fact. Didn't show any emotion. I would say he was emotionless." Millan did not ask during the interview if X. was okay.

Manriquez asked Millan why his parents and others who lived in the house were not allowed to see X. Millan first reported that they "never helped out," then later stated, "We don't get along."

Millan was "very concerned when he realized that deputies would be reviewing the contents of his phone." He repeatedly asked why Manriquez needed to look through his phone but stated, "I don't got nothing to hide on my phone."

On May 4, 2021, social service worker E. Salgado spoke with Millan. Salgado told Millan of X.'s injuries and Millan responded that, according to Jara, a fan had fallen from the wall onto X. Millan reported that Jara told him to tell his parents not to slam the door so hard because doing so caused the fan to fall. Millan reported that he could have caused injury to X.'s right arm by picking him up by his arm while also holding L., who Millan described as being a brat. Jara told him not to do this because X. was not as big as L.

Salgado asked Millan why Jara might have been "acting shady with her phone when asked by deputies." (Boldface omitted.) Millan said he did not know but that she had messaged him on Snapchat, "Leave the hospital because the cops were coming."

## III. The Family's Living Conditions

The residence Millan and Jara shared with Millan's family had three bedrooms and was comprised of approximately 1,500 square feet. There were three adult dogs and six to 12 puppies in the house. Deputies noticed dog feces throughout the house; a strong smell of urine; holes in the walls; roaches climbing the walls, doors, ceiling, and under a crib in Millan and Jara's room; a ceiling fan with exposed wires; dirty dishes and leftover food in the kitchen; and food left out in the living room and bedrooms. The only room in the house with a door that closed was the bathroom.

In Millan and Jara's room, deputies observed several lighters and a propane tank. The door to the room was not hinged and was a foot shorter than the doorway. Their room was the cleanest in the house. There were no dog feces on the floor and there were cleaning products in the room. There were jugs of fresh water, boxed food, baby diapers, formula, and other baby supplies in the room. There was a fan sitting inside a window in the room.

## IV. Testimony and Reports from Millan's Family Members

Millan's sister Wendi[5] lived in the home and testified that Millan and Jara stayed in their room all the time with the door closed. Wendi encouraged them to take the children out of the bedroom but they repeatedly declined. Wendi sometimes cared for X. during the first two weeks of his life.

About two weeks prior to May 3, 2021, Wendi smelled hot sauce while holding X. and noticed that his lips were red with hot sauce. Millan had been eating chips before this and the hot sauce was next to the bed. Both Millan and Jara had been watching X. at the time and blamed each other for X. having hot sauce on his mouth. Millan got defensive and told Wendi to mind her own business.

---

[5] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

On another occasion, Millan grabbed X. with both hands by the legs above his knees and pinched and shook him. Wendi told Millan to stop but he kept doing it a couple more times until X. began to cry and Wendi took him away.

Millan and Jara would pass X. and L. through a window in their bedroom rather than taking them through the front door. This conduct began approximately three weeks prior to May 3, 2021, after an argument with the family regarding household chores or money. Jara told Wendi she did not want Wendi seeing the kids and they stopped letting her see L. However, Millan allowed Wendi to see the children when Jara was away. Sometimes, when Jara was not home, Millan would leave the bedroom door open. Wendi did not see injuries on X. during this time.

Millan and Jara were the only ones to watch X. overnight, during which time they kept their door closed. X. would cry every night for two to three hours. "He would cry in a way like he was hungry at the same time but in pain." When Wendi would ask through the door if X. was okay, Millan and Jara would respond, "Yeah, he's fine. Leave us alone," or, "Just go away. Don't ask."

Millan's father, Elias, spoke with law enforcement on May 3, 2021, and also testified at trial. He reported that Millan and Jara locked themselves in their room and came out only to get food. They treated L. "fine." However, X. would cry a lot at night and Millan and Jara would let him cry and not pay attention. They paid more attention to L. than to X. Elias explained that Jara was a good mother to L. but, after X. was born, she would go out and take only L. with her. Elias did not speak with Jara because she does not understand Spanish and Elias does not understand English.

According to Elias, Millan would sometimes bring X. out of the room and leave the door open. Jara would leave X. with Millan and go to her father's house as often as three to four times per week.

7.

## V.    X.'s injuries[6]

X. was transferred to Valley Children's Hospital, where he was seen by Dr. T. Hubbard, a child abuse pediatrician and hospitalist, on May 4, 2021.  Hubbard first reviewed X.'s chart and noted that X. had a right mandibular condyle fracture and a questionable left mandibular condyle fracture, which Hubbard described as "extremely rare" facial bone fractures that result from motor vehicle accidents, falls, or assault.  X. also had a right midclavicular fracture with callous formation.

X. had right posterior rib fractures involving the third, fourth, sixth, seventh, eighth, ninth, and 11th ribs; right lateral rib fractures involving the second, third, fourth, fifth, sixth, seventh, eighth, and ninth ribs with displaced rib fractures of the sixth, seventh, and eighth ribs; left posterior rib fractures involving the second, third, fourth, fifth, sixth, seventh, eighth, ninth and 10th ribs; and left lateral rib fractures involving the third, fourth, fifth, sixth, seventh, eighth, and ninth ribs.  These fractures were concerning to Hubbard due to their sheer number, as well as the fact that they were bilateral and posterior.  This injury suggests X. was squeezed or gripped strongly.  The consecutive nature of the fractures plausibly aligned with the grips of the fingers of someone's hand. Hubbard opined that bilateral consecutive rib fractures near the spine were classic abusive rib fractures in infants.

X. had a mild compression fracture to his eighth thoracic vertebra.  This injury can result from a baby being slammed onto a hard surface.

X. had numerous classic metaphyseal lesions, also known as corner fractures, which Hubbard described as "probably one of the most specific fractures for child abuse."  Hubbard explained this injury commonly occurs in children less than six months of age and is "the most common fracture in children who die from injuries related to child

---

[6] The parties stipulated that L. was examined by medical personnel on May 3, 2021, and had no injuries.

abuse." These injuries occur from a "tension and/or sheering load as if someone were to yank and pull the extremity." X. had multiple corner fractures to his right and left arms. He also had corner fractures to almost every joint of both legs. In addition to the corner fractures, X. also had other fractures to his arms and legs.

X.'s fractures were in various stages of healing.

When Hubbard examined X., X. was intubated and was in the intensive care unit. He had splints on his right and left legs as well as his right arm. His eyes were bruised and swollen and he had a small laceration over the left eyelid. He had broken blood vessels in both eyes, which Hubbard explained typically results from blunt trauma. Inside his mouth he had a torn upper labial frenulum, which Hubbard explained can result from blunt trauma or forceful insertion of a bottle into an infant's mouth. X. had a bruise on his left chin, a rash on his left neck, and a two-centimeter bruise on his chest. He also had a dark, circular blister on the sole of his right foot that Hubbard opined resulted from application of a foreign implement. X. was anemic and eventually would require a blood transfusion. He had low calcium and abnormal electrolytes. His biomarkers for liver function and liver injury were high, raising concern for intra-abdominal trauma.

X. was tested, with negative results, for conditions predisposing him to fractures. His vitamin D levels were insufficient but not enough to cause bones to fracture more easily. Radiologists noted no evidence of bone disease or bone demineralization.

X. required pain medication and sedation. Hubbard characterized his case as "[v]ery severe." Hubbard opined that his injuries were diagnostic of child abuse. Hubbard further opined that X. would have died had he not received prompt medical attention.

Dr. E. Nagel, a pediatric radiologist at Valley Children's Hospital, testified regarding his review of X.'s radiology imaging. He explained that X. had so many fractures, it was "hard to show normal anatomy" on his imaging. Those included fractures to the left and right arm and leg bones, including several corner fractures, as

9.

well as a mandibular fracture and fractures to nearly all the ribs. The fractures were in at least three different stages of healing. Nagel explained that a corner fracture is a "child abuse specific fracture," which involves ripping cartilage from the end of the bone through a violent shaking motion. Based on the locations of the fractures, it appeared some of the fractures were caused by someone holding X. and squeezing him.

## VI.  Cell Phone Evidence

Law enforcement reviewed Millan's and Jara's phones. Jara deleted from her phone text messages between herself and Millan from January 25, 2021, to April 23, 2021. Other messages from Jara's phone were admitted only against her during trial.

On April 13, 2021, at 4:42 p.m., Jara messaged her mother stating, "I'm breaking out so bad now more than ever because I have. [L.] and [X.] and he plays with them like they're toys. What I'm trying to say is that he'll be nice and shit and then when something happens or doesn't go his way he's like nah u do it I'm not helping . . . ."[7]

On April 14, 2021, at 11:33 p.m., Jara messaged her mother stating, "He over here really ain't a good dad. Lol talking about shut up [L.] or I'ma throw something at you. TF?"

On April 28, 2021, at 9:06 p.m., Jara messaged her mother stating, "Is it okay that I feel like I don't want [X.][?]" She then messaged her mother, "I've been feeling this way for a while now," and "I feel like he's not mine." Her mother responded, "Awwww its the postpartum it makes some ppl feel that way.but y do u think u dont want him??" Jara responded, "He just doesn't feel like he's mine," and, "Like I took him from someone else." Jara continued, "When I hold him I try to make myself feel connected but idk it doesn't feel right."

---

[7] We quote the text messages as presented in People's Exhibits 9, 11, and 15, without corrections to grammar or spelling. The parties stipulated that the timestamps on text messages from Jara's phone were off by seven hours. We have corrected the time and date of these text messages to reflect the time stipulated to by the parties.

On May 2, 2021, at 9:59 a.m., Jara messaged a contact named Cynthia stating, ". . . I barely woke up kinda lol [X.] was being a crybaby last night." About one hour later, she also messaged her father stating, "Okay dad I just woke up [X.] was being a cry baby all night."

On May 3, 2021, at 6:00 p.m., Jara messaged her mother stating, "IK I fucked up I'm not texting anymore I said his arm is broken his leg is swollen and he has a bruise on his chest." Immediately after, Jara messaged her mother stating, "He keeps texting me. I feel so fucken stupid I never took care of [X.] the right way."

Messages from Millan's phone also were admitted. On March 31, 2021, at 5:49 p.m., Millan messaged Jara, "I am sorry too baby I should've just been cool and said fuck it at least we're ok instead of getting mad cause I know I shouldn't do and said anything that I did I was mad cause I was hungry and thirst asf but that's not an excuse for the way I acted I really am sorry for putting my hand on you but I didn't wanna hurt you just push you away and I understand baby fuck anything it's big girls birthday it should of been Awesome sorry again baby I really love you I am sad wanting to cry cause I know I shouldn't have acted like that you're my wife my babies are lucky to have a bad ass mom like you."

On April 5, 2021, at 4:15 p.m., Jara messaged Millan, "And stop burning shit cause I can smell tht." Millan responded, "What? You said stop burning shit and I said I did stop." On April 6, 2021, at 4:18 p.m., Millan messaged Jara, "I took off his onesie baby I was burning him and he threw up mamas."

On April 11, 2021, at 12:38 a.m., Jara messaged Millan the following messages: "Please be nice to [L.]," followed by "Don't be mean to her put her to bed please." Later that morning, Jara messaged, "Idk why ur acting like this"; "[L.] isn't even bad"; and "She's a great kid."

Additionally, photographs from Jara's phone were admitted and published to the jury. A photograph dated April 11, 2021, showed X.'s hands with bruising and redness.

11.

Several photographs dated April 26, 2021, showed a healing burn on the bottom of X.'s heel. A photograph dated April 29, 2021, showed bruising and discoloration on the sides of X.'s stomach and lower chest area, as well as the center of his chest. A photograph dated April 30, 2021, showed discoloration on X.'s abdomen. A photograph dated May 2, 2021, showed bruising on X.'s right eye.

Millan also had photographs of the children on his phone. He had "more than ten" photographs of [L.] but only one photograph of X.

## VII. Defense Case

### A. Jara's Mother

Jara's mother Nilmar testified that she and Jara's father divorced when Jara was approximately 11 years old. Jara lived with Nilmar until she was 18 years old. Jara and Millan entered into a relationship a few months before Jara turned 18 and the couple lived with Nilmar. They moved out a few months after Jara turned 18 and moved in with Millan's parents. By that time, Jara was already pregnant.

Once, when Jara was pregnant with L., Nilmar saw that Jara had bruises on her. Another time when Jara was pregnant with X., Nilmar saw that she had a black eye. Nilmar did not see how the injuries occurred.

Jara did not have a car, and Nilmar would visit her and give her rides to places such as the store, the laundromat, and the doctor. On May 3, 2021, Jara called Nilmar for a ride to urgent care. While they were at urgent care, an ambulance arrived and took X. Jara rode in the ambulance with X. and Nilmar took L. to her house, then subsequently to the hospital.

### B. Jara's Father

Jara's father Bryan testified that he lived approximately one and a half miles away from Jara and Millan. Once or twice a week, he would pick Jara up and bring her to his house, where she would stay for two or three hours. Additionally, she would walk to his

house a couple times each week. Jara always brought L. to Bryan's house but did not bring X.

On May 2, 2021, Jara and L. attended a birthday party for Jara's stepsister at Bryan's house.

In September or October of 2019, Bryan saw that Jara's eye was bruised. On that occasion, Bryan received a call from his wife and son and went to pick Jara up at the house she shared with Millan. Bryan also called the police.

## C. Jara's Stepmother

Jara's stepmother Cynthia also testified. Cynthia met Millan twice. The first time was in a Walmart parking lot, where he threatened her, stating, "I will kill you, bitch. I already got three bodies." Jara was present. Cynthia reported the incident to law enforcement. In another encounter in 2019, Cynthia and Bryan went to Millan's family's house to retrieve Jara. Millan tried to prevent her from leaving by holding her shirt and telling her she was not going to go. Jara had a black eye.

After X. was born, Jara would visit Cynthia and Bryan's house with L. but would not bring X.

Jara and L. came to a birthday party at Cynthia's house on May 2, 2021, and Cynthia gave them a ride home at approximately 9:00 p.m.

Cynthia had custody of X. at the time of trial. She took custody of him when he got out of the hospital at four-and-a-half months old. At the time of trial, X. continued to have a visible two-inch scar on the left side of his neck under his jaw and a small scar on the bottom of his foot. He had a severe speech delay. L. also had a speech delay.

## D. Jara's Testimony

Jara testified that she met Millan through social media when she was 17. They first moved in with her mother, then moved to his family's house on Jara's 18th birthday. Tension arose with Millan's family while she was pregnant with L. and the family wanted her and Millan to leave the house.

13.

Millan committed acts of domestic violence against her for almost their whole relationship. When she was 17, he pushed her down and she fell in the street. He said he was sorry and she did not report the incident.

Another incident occurred at Millan's family's house while Jara was four or five months pregnant with L. Millan pushed Jara and told her if she got up, he was going to kick her in her stomach. She did not seek medical treatment. She did not report the incident because she loved Millan and did not want to see him in trouble.

In another incident while Jara was pregnant with L., Millan hit her in the arm and she left for a few days. She came back because she wanted to keep their family together.

The abuse continued after L. was born. On Jara's 19th birthday, Millan hit Jara in the face while she was holding L. She did not report the incident.

When L. was approximately six months old, Jara left Millan again but eventually came back.

While Jara was pregnant with X., she and Millan argued and Millan hit her with the plastic handle of a loofah and then hit her in the head. Jara reported this incident to law enforcement and left with L. for about two weeks before she went back.

After X. was born, Millan hit Jara in her eye or eyebrow area while at his family's house. Jara did not report the incident because she did not see the point.

Jara acknowledged that she was jealous during her relationship with Millan and would go through his phone. Throughout their relationship she discovered he had sexual communications with other women. She denied that she assaulted Millan during confrontations over other women and instead testified that she would hit him back during confrontations in which he hit her first. In one such instance, on January 6, 2020, she hit him with a phone cord after discovering he was having an affair.

When X. was born, he was treated for jaundice at the hospital. On April 7, 2021, Jara took X. to a medical follow-up appointment for jaundice. X. also was treated for thrush. On April 19, 2021, Jara took X. to a medical appointment for what she thought

was a neck infection. On neither visit did medical personnel express any other concerns about X.'s condition. Law enforcement and child protective services did not arrive at either visit.

On April 11, 2021, Jara noticed X.'s penis and testicles were swollen. She attempted to get a ride to the doctor and, when she could not find one, called for an ambulance. X. was treated at the hospital. No doctor or nurse expressed other concerns about X., and law enforcement and CPS did not arrive. Jara used her phone to take photographs of X.'s hands on that date because she was upset and wanted to document that the nurses bruised his hands while drawing blood.

Jara acknowledged that, on April 14, 2021, she texted her mother, "Mom, if anything happens I want you to have full parental custody of my kids because [Millan] isn't a fit parent. If he hits me imagine what he would do to my kids if I'm not here." (Boldface omitted.)

On April 26, 2021, Jara used her phone to take photographs of X.'s mouth because she thought his thrush was getting worse. Jara took other photographs that day of X. and his outfit, which also showed the injury to X.'s left foot.

On April 29, 2021, Jara used her phone to take a photograph showing bruising on X.'s chest and torso. She asked Millan if he knew what happened and he reported it was the first time he had seen it.

On May 2, 2021, Jara received a photograph from Millan that showed X. drinking a bottle and in which an injury to his eye could be seen. Jara believed Millan sent her the photograph to show her that X. was okay. Jara had personally seen X. scratch his own eye the previous Friday.

On May 3, 2021, Jara noticed X.'s eye was getting worse and his leg was swollen. Jara's mother picked up Jara, X., and L. and took them to the urgent care. Jara brought L. because Millan was upset that Jara wanted him to watch her. From urgent care, Jara went with X. by ambulance to the hospital, and her mother brought L. to the hospital. Jara did

not learn that X. had broken arms and legs until she was at the hospital. She learned even later that he had broken ribs. She did not learn that the mark on X.'s foot could be a burn instead of a result of medical treatment until this was mentioned by Ackerman.

Jara testified that, on the morning of May 3, 2021, Millan insisted on getting X. changed and ready to go to urgent care. Millan often insisted on dressing X. Jara acknowledged that Millan often got up to attend to X. when he would cry at night. Jara acknowledged that she spent a lot of time with her parents after X.'s birth. She brought L. with her on these visits but not X. because he was a newborn and did not have his shots.

Jara explained that, after she found out the extent of X.'s injuries, Millan continued to send her text messages, but she did not respond. She also began deleting prior text messages between herself and Millan from her phone because she was angry.

Jara denied ever grabbing X. by his arms or legs, slamming him down, squeezing his ribs, burning him, forcing a baby bottle into his mouth, or striking, bruising, or injuring him. On one occasion, she saw Millan pick up X. roughly by his legs while changing his diaper, and she told Millan to be careful because X. was not as big as L. She never saw Millan intentionally harm X., and never helped or encouraged him to harm X. She acknowledged Millan told her about the incident with the falling box fan, but he told her the fan did not hit X. If she knew Millan or anyone in the household was harming X., she would have called the police.

Jara denied that she and Millan passed X. out of their bedroom window. She acknowledged there was a time they passed L. out of the bedroom window because they were feuding with his family and did not want them to see her. She would take L. to her father's house so she could play and be safe despite her living environment, but Jara thought X. would be safe in his bassinet.

16.

Jara stated that she did not want to stay in Millan's family's home because of the way Millan treated her and L., but she had nowhere else to go and Millan had threatened to take L. from her if she left.

Once while on a transport bus in relation to the instant case, Jara heard Millan say that he was being held for attempted murder, which sounded to her like bragging. In another instance when they were en route to court, Jara pushed Millan and stated, "It's all your fault." (Boldface omitted.)

Millan told Jara that he never wanted a boy. Jara testified that she paid Millan $20 or $25 to stay home with X. on May 2, 2021, when she went to visit her family. She was not comfortable leaving X. with Millan but felt she did not have any other choice. She explained that she would pay Millan to watch X. approximately twice a week, and would "buy him food or something so he'd just be chill."

In June 2019, Jara was convicted of misdemeanor shoplifting.

## DISCUSSION

## I. Evidence Supporting the Jury's Finding that Jara Personally Inflicted Great Bodily Injury on X.

Jara argues insufficient evidence was presented to support the jury's true finding on the great bodily injury enhancement to count 3, and the true finding therefore violates her federal constitutional right to be convicted only upon proof of every element of the offense. Specifically, she contends the evidence is insufficient to prove she personally inflicted great bodily injury on X., or that her failure to exercise her duty of care resulted in the personal infliction of great bodily injury. Rather, Jara contends she was convicted under a legally flawed theory of aiding and abetting the personal infliction of great bodily injury. These arguments have merit. The evidence does not support finding that Jara personally inflicted great bodily injury on X., as required to support the great bodily injury enhancement.

17.

## A. Standard of Review

"In considering a sufficiency of the evidence claim, we review 'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Substantial evidence is ' "evidence that 'reasonably inspires confidence and is of "solid value." ' " ' " (*People v. Collins* (2025) 17 Cal.5th 293, 307 (*Collins*).) "The test for evaluating a sufficiency of evidence claim is deferential," and we must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

## B. Applicable Law

Section 12022.7, subdivision (d) provides: "Any person who *personally inflicts* great bodily injury on a child under the age of five years in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for four, five, or six years." (Italics added.) For this enhancement to apply, "the defendant must be the direct, rather than [the] proximate, cause of the victim's injuries." (*People v. Warwick* (2010) 182 Cal.App.4th 788, 793, italics omitted (*Warwick*); see *People v. Cole* (1982) 31 Cal.3d 568, 572 (*Cole*).) "[A] person who merely aids, abets, or directs another to inflict an injury is not subject to the enhanced penalty of section 12022.7." (*People v. Ollo* (2021) 11 Cal.5th 682, 692.) The contours of the requirement that the defendant personally inflict great bodily injury have evolved over a series of cases.

In *Cole*, the defendant directed his accomplice to kill the victim and aided in the accomplice's beating of the victim by holding a gun on the victim and blocking the victim's escape. (*Cole, supra,* 31 Cal.3d at p. 571.) The court held the defendant's

conduct did not rise to personal infliction of great bodily injury: "[T]he Legislature intended to impose an additional penalty for causing great bodily injury only on those principals who perform the act that directly inflicts the injury, and . . . one who merely aids, abets, or directs another to inflict the physical injury is not subject to the enhanced penalty of section 12022.7." (*Ibid.*)

In *Cross*, the high court considered whether a pregnancy resulting from nonforcible sexual conduct with a minor was an injury that could support a finding of great bodily injury. (*People v. Cross* (2008) 45 Cal.4th 58, 63 (*Cross*).) The court rejected the argument that the enhancement requires the application of force and explained: "[T]he meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning. Commonly understood, the phrase 'personally inflicts' means that someone 'in person' [citation], that is, directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured.' " (*Id.* at p. 68; see *id.* at p. 66.)

Numerous appellate court cases have applied the standards announced in these cases. For example, in *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 346, the court considered whether the defendant personally inflicted great bodily injury when he was tackled by an officer while fleeing on a bicycle, which caused both men to fall to the ground. The court held, "To 'personally inflict' injury, the actor must do more than take some direct action which proximately causes injury. The defendant must directly, personally, himself inflict the injury." (*Id.* at p. 349.) Because the defendant "was trying to escape arrest on a bicycle and the officer injured himself when he tackled [the defendant]," the evidence did not show the defendant directly injured the officer. (*Id.* at p. 352.)

In contrast, in *People v. Frazier* (2009) 173 Cal.App.4th 613, 615–616, the court considered whether the defendant personally inflicted great bodily injury when he commanded a dog to attack the victim. The court rejected the argument that "the dog in

this case stands in the same role as the person in *Cole*, *supra*, 31 Cal.3d 568 who hit the victim." (*Id.* at p. 617; see *id.* at p. 618.) The court noted that a dog does "not possess the legal ability to commit crimes" and "cannot be a principal to a crime." (*Id.* at p. 618.) Instead, "[a] dog may be the instrumentality of an attack causing great bodily injury just as a loaded gun or knife can be." (*Ibid.*) Accordingly, the court held *Cole* was inapposite and determined the evidence supported the jury's finding that the defendant personally inflicted great bodily injury. (*Id.* at pp. 619–620.)

Most relevant to the instant case, in *Warwick*, the Court of Appeal extended liability for personally inflicting great bodily injury to injuries resulting from a parent's "failure to act where action is required." (*Warwick*, *supra*, 182 Cal.App.4th at p. 795.) There, the defendant, who had concealed her pregnancy, gave birth to a baby at home in the late morning. She cut the umbilical cord with scissors, cleaned the baby's mouth, and tucked a blanket around him. (*Id.* at pp. 790–791.) She initially sent her mother away when she came to the door. (*Id.* at p. 791.) However, at around 3:00 p.m., family members discovered the baby, saw that he was in distress, and called paramedics. (*Ibid.*) Paramedics determined the baby had a low respiratory rate, and was pale, unresponsive, and nearly in cardiac arrest. (*Ibid.*) At the emergency room, doctors observed that the baby had low oxygen, and was cool, suffering from respiratory failure, and in a coma. (*Ibid.*) A neonatal specialist described the baby as hypothermic and opined that the baby's low body temperature could be explained by leaving him uncovered for five to six hours. (*Id.* at pp. 791–792.) The baby was determined to have dead brain cells in the center of his brain, likely caused by hypothermia and lack of oxygen, and as a result of which "the baby might experience learning or behavioral problems in the future, though it was also possible he would suffer no long-term consequences." (*Id.* at p. 792.)

The defendant in *Warwick* argued that personal infliction of great bodily injury requires " 'personal and direct application of force' " (*Warwick*, *supra*, 182 Cal.App.4th at p. 793), or other "affirmative action" (*id.* at p. 795), rather than "a 'passive failure to

20.

act' " (*id.* at p. 793). The Court of Appeal disagreed and held that a defendant may personally inflict great bodily injury by "fail[ing] to act where action is required."[8] (*Warwick*, *supra*, 182 Cal.App.4th at p. 795.) Furthermore, even assuming "affirmative action" is required, the defendant's actions, including "partially covering [the baby] with a blanket rather than properly swaddling him," directly caused his injuries. Additionally, sending her mother away was an affirmative action that kept the baby from getting help for several hours. (*Ibid.*)

### C.    Analysis

The People argue substantial evidence supports a finding that Jara directly and personally caused X.'s injuries, either by failing to take action to prevent Millan's abuse, or by concealing X.'s injuries. Neither argument supports a finding that Jara personally inflicted great bodily injury under the facts of this case. As such, we conclude substantial evidence does not support the jury's true finding on the great bodily injury enhancement.

We note as an initial matter that the People did not advance these arguments in the trial court. Indeed, the People did not allege at any point prior to appeal that Jara directly caused injury to X. To the contrary, the People argued in closing that the great bodily injury enhancement was true, even if Jara *never directly caused* injuries to X., and erroneously urged the jury to find the great bodily injury enhancement true under an aiding and abetting theory.[9] The prosecutor argued, "Just to clarify as to Ms. Jara as to the attempted murder, the torture and the felony child abuse and the misdemeanor child abuse and *all of the great bodily injury enhancements*, she is guilty of those through *an aiding and abetting theory* for failure to protect theory." (Italics added.)

---

[8] "A duty to act may derive from the express terms of a statute, another statute, or common law." (*Collins*, *supra*, 17 Cal.5th at p. 308.) "[A] parent's failure to act can constitute an affirmative act for the purposes of criminal liability in some situations." (*Ibid.*)

[9] On appeal, the People concede this argument was erroneous.

The People's arguments on appeal, although couched in the language of direct and personal infliction of great bodily injury, are merely a retooling of their aiding and abetting arguments presented in the trial court. The People begin with the undisputed proposition that Jara had a duty to protect X. They are correct that " ' "[a] parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child." ' " (*Collins*, *supra*, 17 Cal.5th at p. 308.) Jara's failure to fulfill this duty by failing to protect X. from Millan's abuse formed the basis for her aiding and abetting liability on the offenses of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), and felony child abuse (§ 273a, subd. (a); count 3), neither of which required her to personally or directly inflict the abuse (see *Collins*, at p. 310 ["[C]riminal liability based on the failure-to-protect doctrine does not necessarily require that the parent be present for or actively participate in the perpetrator's acts."]). Jara does not dispute that substantial evidence supports a finding that she failed to fulfill her parental duty to protect X., and she does not challenge her convictions on these offenses.

However, the People do not articulate how Jara *personally* inflicted great bodily injury on X. through her failure to protect X. from Millan's abuse. They merely suggest the unremarkable proposition that, by failing to fulfill her duty to protect, she permitted Millan to cause further injury. But section 12022.7 does not permit a finding that Jara personally injured X. through Millan's actions. Our Supreme Court has made clear that personal infliction of great bodily injury is " 'done . . . without the intervention of another [and] direct from one person to another.' " (*Cole*, *supra*, 31 Cal.3d at p. 572.) Injury inflicted through an intermediary is not "personally" inflicted within the meaning of section 12022.7. (*Cross*, *supra*, 45 Cal.4th at p. 68.) Indeed, even if Jara had *ordered* Millan to commit the abuse of X., she could not be held liable for the resulting injuries

under section 12022.7.  (*Cole*, at p. 571.)  Accordingly, the People's argument – that Jara personally inflicted injuries that were directly caused by Millan – is unsound.

Nor does *Warwick* support a finding of great bodily injury under the facts of this case.  There, the defendant's neglect of her duty to protect her child "led directly" to the child's injuries.  (*Warwick*, *supra*, 182 Cal.App.4th at p. 795.)  Unlike the instant case, the injuries in *Warwick* were *caused* by parental neglect, and not by an intermediary or the intervention of another.  The People do not cite, and we do not find, any case that extends the rationale of *Warwick* to injuries caused by another actor.  Accordingly, we reject the People's contention that *Warwick* is analogous to the instant case.

We also reject the People's contention that Jara personally inflicted great bodily injury on X. by "not allowing other members of the Millan household to see X." which, the People contend, "allowed further abuse by [Millan] and delayed the medical care X. needed."  As an initial matter, we are skeptical that the parental duty of care required "allowing other members of the Millan household to see X." under the factual circumstances of this case.  In any event, both Wendi and Elias testified that Millan allowed them access to X. when Jara was not home.  In other words, Wendi and Elias had access to X., saw no cause for concern, and took no action to prevent the abuse or obtain medical care for X.  There are no facts to support a finding that Jara personally inflicted injury on X. through her attempts to alienate him from Millan's family.

Nor do the facts support a finding that Jara personally inflicted injury on X. by delaying needed medical care.  Jara sought medical care for X. on several occasions, including on the May 3, 2021 visit that ultimately saved his life.  Had Jara raised Millan's abuse to medical professionals at any of the earlier visits, perhaps she could have avoided the additional abuse X. subsequently faced at Millan's hands.  However, as stated, Jara did not personally inflict that subsequent abuse, and she cannot he held liable under section 12022.7 for Millan's acts.  And, although the People suggest Jara's unspecified delays in obtaining medical care for X. "increas[ed] the severity of his injuries," they do

23.

not cite, nor do we find, facts in the record to support an inference that X. was further injured by delays in receiving medical care.

In sum, the evidence does not support a finding that Jara personally inflicted great bodily injury on X. Accordingly, we vacate the true finding on the great bodily injury enhancement to count 3 as it pertains to Jara. We need not, and therefore do not, address Jara's challenge to the related jury instructions. In light of our disposition, we vacate Jara's sentence and remand for a full resentencing to allow the court to consider its sentencing choices. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## II.     Evidence Supporting Millan's Conviction for Attempted Murder[*]

Millan argues insufficient evidence was presented to support his conviction for attempted murder, and his conviction therefore violates his federal constitutional right to be convicted only upon proof of every element of the offense. More specifically, Millan contends the evidence does not support a finding he intended to kill X. despite his perpetration of significant abuse. He asserts that, had he intended to kill X., he easily could have done so, and X.'s survival therefore negates a finding that he intended to kill. We disagree and conclude substantial evidence supports the conviction.

### A.     Applicable Law

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) For the offense of murder, malice may be express or implied. (§ 188, subd. (a).) However, " '[t]he mental state required for attempted murder has long differed from that required for murder itself.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

---

[*] See footnote, *ante*, page 1.

"Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*People v. Smith*, *supra*, 37 Cal.4th at p. 739.) "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' " ' " (*Ibid*.) Because there is rarely direct evidence of a defendant's intent, intent to kill may "be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.)

### B. Analysis

Substantial evidence supports the jury's finding that Millan intended to kill X.

Intent to kill may be inferred from a defendant's conduct. Here, X. had fractures to both arms and legs, his facial bones and clavicle, multiple ribs, and his thoracic vertebra. The rib fractures were consistent with someone holding X. and squeezing him on at least three separate occasions. The fracture of the thoracic vertebra was consistent with X. being slammed onto a hard surface. Many of the fractures were corner fractures, which are caused by yanking or pulling on the extremities and commonly occur in children less than six months of age who die from injuries related to child abuse. Indeed, without medical care, X. would have died. A reasonable jury could infer from Millan's conduct – repeatedly squeezing, slamming, and pulling on the vulnerable body of a newborn infant with force significant enough to cause life-threatening injuries – that he acted with intent to kill. (Cf. *People v. Avila* (2009) 46 Cal.4th 680, 701–702 [repeatedly stabbing defenseless victim is substantial evidence of intent to kill]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["sheer number of wounds" implies intent to kill]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [stabbing a victim with all the defendant's might in an extremely vulnerable area supported finding of intent to kill].)

We reject Millan's contention that his failure to kill X. reflects he did not intend to do so. "[A] defendant may properly be convicted of attempted murder [even] when no injury results." (*People v. Avila*, *supra*, 46 Cal.4th at p. 702.) Moreover, as stated, X.'s treating physician opined that X. would have died had he not received life-saving medical

25.

care. In other words, the force applied by Millan was sufficient to cause X.'s death. The evidence therefore suggests X.'s survival is not attributable to Millan's restraint, but instead to medical intervention.

Millan's reliance on cases involving "close-range shootings" is unpersuasive. Millan contends these cases are relevant because they show "a violent act by itself does not necessarily demonstrate intent to kill," and his "significant" abuse of X. similarly does not demonstrate an intent to kill. The primary cases relied on by Millan – *People v. Ratliff* (1986) 41 Cal.3d 675 and *People v. Johnson* (1981) 30 Cal.3d 444 – are inapposite on this point because they did not involve challenges to the sufficiency of the evidence of intent to kill. Rather, both cases involved instructional error that permitted the jury to find the defendants guilty of attempted murder under an implied malice theory. (*Ratliff*, at p. 695; *Johnson*, at pp. 447–448; cf. *People v. Lee* (1987) 43 Cal.3d 666, 679.) In both cases, the high court held the defendant's act of shooting the victim did not "*conclusively demonstrate* an intent to kill as to render harmless the error in instructions." (*Ratliff*, at p. 696, italics added; see *Johnson*, at p. 449.) Here, we are not called to determine whether the evidence *conclusively demonstrates* Millan's intent to kill, but rather whether the evidence, when viewed in the light most favorable to the judgment, is such that a reasonable trier of fact could infer from the circumstantial evidence that Millan acted with intent to kill. (See *Collins*, *supra*, 17 Cal.5th at p. 307.)

For the reasons stated, we conclude substantial evidence supports the jury's finding of intent to kill.

## III.    Evidence Supporting Millan's Conviction for Torture[*]

Millan argues insufficient evidence was presented to support his conviction for torture, and his conviction therefore violates his federal constitutional right to be convicted only upon proof of every element of the offense. More specifically, Millan

_____

[*] See footnote, *ante*, page 1.

26.

contends the evidence does not support a finding he harbored the intent to torture X. or acted with sadistic intent. Rather, he contends the evidence indicated he abused X. out of frustration and anger.

### A. Applicable Law

Section 206 provides: "Every person who, *with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose*, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture." (Italics added.) "Thus, for purposes of section 206, torture has two elements: (1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Massie* (2006) 142 Cal.App.4th 365, 370–371 (*Massie*).)

"Torture focuses upon the mental state of the perpetrator." (*Massie*, *supra*, 142 Cal.App.4th at p. 371.) "Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain." (*People v. Burton* (2006) 143 Cal.App.4th 447, 452 (*Burton*).) "Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain." (*Ibid.*)

The California Supreme Court has " 'cautioned against giving undue weight to the severity of the wounds' [citation]; severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.) " 'It does not follow, however, that because *the severity* of the victim's wounds is not necessarily determinative of the defendant's intent to torture, *the nature* of the victim's wounds cannot as a matter of law be probative of intent.' " (*People v. Pre* (2004) 117 Cal.App.4th 413, 421, italics added.) The jury also may consider whether repeated and deliberate attacks on "an area of the body that is already injured" suggest the intent to cause severe pain " 'over and above the level of pain that a victim

would suffer in an ordinary assault or battery.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Additionally, the jury may consider whether the defendant "deliberately exposed the victim to prolonged suffering." (*Mungia*, at p. 1137.)

Anger is not "inconsistent with an intent to inflict cruel or extreme pain and suffering, which may be the result of 'mere unconsidered or rash impulse hastily executed.' " (*Massie*, *supra*, 142 Cal.App.4th at p. 372.) "The role that anger may have played in a criminal attack is a matter for the jury to determine. In many circumstances, the jury may determine that anger was the reason that the accused formed the intent to inflict injury. There is nothing logically or legally inconsistent in such a determination. On the other hand, if the jury believes the accused acted in such a mindless rage that thought processes were impossible, then it may conclude he did not harbor the intent to inflict injury. The proper inferences to be drawn are the province of the jury and not an appellate court." (*Ibid.*)

As stated, the defendant's intent to cause cruel or extreme pain and suffering must be for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. "[R]espect, revenge, extortion, and persuasion are self-explanatory." (*Massie*, *supra*, 142 Cal.App.4th at p. 371.) "Black's Law Dictionary defines 'sadism' as 'a form of satisfaction . . . derived from inflicting harm on another.' " (*Burton*, *supra*, 143 Cal.App.4th at p. 453.) Thus, "[s]adistic purpose encompasses the common meaning, ' "the infliction of pain on another person for the purpose of experiencing pleasure." ' [Citation.] While sadistic pleasure is often sexual, the statute does not require a sexual element." (*Massie*, at p. 371.)

**B.    Analysis**

Millan contends the evidence was insufficient to establish he derived any sadistic pleasure from his abuse of X., but rather established that he acted out of frustration and anger with his childcare responsibilities and X.'s crying.  We disagree.

The nature of X.'s injuries constitutes substantial evidence that Millan acted with a sadistic purpose, i.e., to derive satisfaction from inflicting harm on X.  Millan deliberately and repeatedly caused fractures to X.'s body on at least three separate occasions, often to parts of his body that were already injured and broken.  Millan also burned the bottom of X.'s foot with a foreign object, causing sufficient injury for the skin to blister and pop.  The jury reasonably could conclude this type of injury to a vulnerable infant's foot reflects an obvious sadistic purpose.  (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1274; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.)  In some instances, the evidence suggests Millan may have acted out of anger or frustration, such as when he acted in response to X. crying.  However, Millan's anger and frustration are not necessarily inconsistent with an intent to inflict suffering for personal satisfaction.  (*Massie*, *supra*, 142 Cal.App.4th at p. 372.)  The role of anger in Millan's conduct was a factual issue for the jury to decide.  Moreover, in at least one instance, it appears Millan acted without provocation:  Wendi witnessed Millan grabbing X.'s legs, pinching and shaking them until X. began to cry and Wendi took him away.  In sum, the jury could infer from Millan's conduct and the nature of X.'s injuries that Millan acted in such a manner as to maximize X.'s pain for his own satisfaction.

Millan's repetitive and relentless infliction of gratuitous pain on X. over a prolonged period and through acts of extreme brutality constitutes substantial evidence that Millan acted for his own pleasure or satisfaction.  Accordingly, sufficient evidence supports Millan's torture conviction.

## **DISPOSITION**

As to Millan, the judgment is affirmed.

As to Jara, the true finding on the great bodily injury enhancement to count 3 is vacated.  The sentence is vacated and the matter is remanded for resentencing.  The judgment is otherwise affirmed.

DETJEN, Acting P. J.

WE CONCUR:

FRANSON, J.

DE SANTOS, J.